May it please the Court, The Judgment and Damages Award in this case were based on the erroneous legal conclusion that the parties had entered a valid oral contract to modify the written purchase and sale agreement. That conclusion was wrong for three independent reasons, any one of which requires reversal. The District Court also abused its discretion by excluding evidence as a sanction for not producing non-existent documents. And that evidentiary error requires, at a minimum, a new trial in this case. Now to begin, the most glaring error here is that the supposed oral contract to extend time for Mr. Aime to obtain a valid ETHN and repurchase his former franchises lacked consideration. Indeed, the District Court did not identify any consideration for the extension or address the issue at all, even though Liberty raised it throughout the trial. Under Virginia law, an extension of time to exercise an option must be accompanied by new consideration or the offeror may withdraw the option at any time before it's exercised. This was the clear holding of the Virginia Supreme Court in the Cummins case. There, an individual held an option to purchase real estate and requested two additional weeks. The seller granted the two-week extension, but two days later revoked it by agreeing to sell the property to someone else. And the court held that that revocation was allowed because there had not been consideration for the two-week extension. The court contrasted that with a situation where there is consideration to hold an option open and said in that case the seller is required to hold the option open until the extinction of the option. Here, Mr. Aime not identified any new reciprocal obligation that he agreed to undertake in exchange for Liberty agreeing to hold the option open until the end of the year. Can I ask you this? After May 8th, did the appellee here incur any additional expense, such as continuing to pay rent or paying utilities or keeping its processing center open beyond that option date and reliant, allegedly, on this promise? No, Your Honor. Those payments of rent or other expenses relate to the P.A. and the P.S.A. Those are not new. I don't know what is the P.S.A. I apologize, Your Honor. The purchase and sale agreement. I'm talking about after May 8th, the option would have expired. So did Mr. Hugh, I'm sorry, Mr. Aime, after that time actually incur expense in reliance, of course, if the option ended he would have no further interest. Were there any expenses incurred after May 8th, allegedly in reliance upon that new promise? No. There were expenses after May 8th because of the purchase and sale agreement. Importantly, Your Honor, the May 8th date applies only to this option to repurchase. It doesn't end the rest of the purchase and sale agreement. The purchase and sale agreement sold these businesses to Liberty. So Mr. Aime's former franchises became Liberty's offices. Liberty operated those nine offices. It was responsible under the P.S.A. for paying those expenses, which it did here by reimbursing, or it was obligated to reimburse Mr. Aime. And that obligation on both parties, for both parties, extended past May 8th. The May 8th deadline only has to do with Section 3, the option to repurchase. His obligation to continue to cooperate with Liberty extended past May 8th because of the purchase and sale agreement. Did the appellant actually reimburse him? Pardon? Did the appellant actually reimburse him for those expenses incurred after May 8th? The district court found that there had been a breach of Liberty's obligation to reimburse for some of the expenses. Liberty paid many of the expenses, but the court found as early as March that there were some expenses that Liberty had failed to reimburse. Including those after May 8th? I'm sure that includes some then. But, Your Honor, that's a breach of contract. That doesn't retroactively make it consideration for a promise that Mr. Aime claims was made in April. And I think this is an important point that under the PSA, or the purchase and sale agreement, Mr. Aime was obligated to take no action that could hinder Liberty in its business. This is something he promised to do, and it obligated him also to assign leases or other agreements at Liberty's request. So here, his obligation to cooperate with Liberty, which had involved before May 8th and after May 8th, him paying expenses and Liberty reimbursing, that obligation is traceable to the purchase and sale agreement. It has nothing to do with the extension. He claims that he would have canceled the leases and the utility contracts, but as we point out in our brief, he could not have done that because of this obligation not to hinder Liberty in its operation of the businesses. And again, that obligation did not end on May 8th. May 8th is only relevant because it's the last date he could exercise this option. And again, he says Liberty didn't reimburse, but that's a breach of contract. And the fact that he asserted a breach of contract in the district court for these unreimbursed expenses shows that he didn't consider himself obligated to pay without reimbursement, which he would have been if this was really consideration. I would also point out that his renewed efforts to secure an EFIN cannot be considered consideration here because the extension did not obligate him to undertake those efforts. He was not obligated to obtain an EFIN under the extension. He was given the option to obtain an EFIN and repurchase. But there must be mutual obligation for consideration, which did not exist here. Any effort to try to obtain the EFIN was merely an effort to exercise the option, which is in every single case we have an option contract, there must be some effort to exercise it. That is not the consideration that's required under Virginia law. Did he continue his efforts after May 8th to get his EFIN? He did. He claims that he continues his efforts after May 8th. But again, that's not an obligation that he undertook in exchange for Liberty holding it open. I think it's quite clear under the Cummings case that without consideration, without an obligation on Mr. Ame flowing to Liberty, Liberty was not required to hold the extension open until the end of the year. Even if it had made that offer, it was not required to hold it open. It could revoke it, which it did when it told Mr. Ame that he would not be entitled to repurchase. This, of course, may also reverse the judgment on a second independent ground, which is that the alleged oral modification of the purchase and sale agreement did not satisfy the statute of frauds. The PSA here was required to be in writing because of the statute of frauds, therefore it couldn't be orally modified, as Mr. Ame claims. The covenants not to compete, the covenants not to solicit clients, and the covenant not to enter into any competing leases stretched for two years. And that's two years from the date that the purchase and sale agreement was entered. That's not two years from termination. It's two years from the date that the purchase and sale agreement was signed. Mr. Ame obviously couldn't complete those obligations within one year, therefore the purchase and sale agreement was required to be in writing. What's the role, potentially, of equitable estoppel to prevent the invocation of the statute of frauds? Is that the absence of a hearing? It's not here. Virginia courts allow estoppel to overcome the absence of a writing when enforcing a statute of frauds would cause a fraud or cause a wrong to be perpetrated. So Mr. Ame was required to show that he undertook a costly change of position in reasonable reliance on Liberty's alleged promise. And respectfully, here, there was no change of position to Mr. Ame's detriment. He was in the same position both before and after the alleged extension. Before the alleged extension, he was paying on contracts that were under his name, and Liberty was obligated to reimburse him, and he was obligated not to do anything that would hinder Liberty's operation of the businesses. The exact same thing was true after the alleged extension. He continued to be obligated to cooperate with Liberty. Liberty was required to reimburse him, and there was no change in either party's position. This is completely unlike the estoppel cases where a party enters into an agreement to do work and then buys lots of new equipment to satisfy that or moves to a different state and sells its business. There's no sort of costly change to position here that would require estoppel to overcome the statute of frauds, which clearly applies here. With regard to the statute of frauds, what is the relevance of the fact that it's dealing with a five-year franchise agreement? How does that impact that analysis? So the five-year franchise agreement and the termination of those agreements is a separate reason why the purchase and sale agreement had to be in writing. The covenants are sufficient on their own to require it to be in writing, but the fact that the purchase and sale agreement terminated five-year franchise agreements also required it to be in writing because a contract that's required to be in writing also must be in writing. The modification must also be in writing. Here, the modification of the five-year franchise agreements or termination certainly had to be in writing. That's the sort of thing that we want to have proof of because of the importance of the contract. So I think there's no argument that under Lindsay from the Virginia courts that the modification or termination of the franchise agreements had to be in writing. Certainly, if a modification has to be in writing, parties cannot really agree to terminate the sales or termination. Excuse me, are there any other reasons, except beyond the two that you already discussed, that you feel would dictate the application of the statute of frauds? No, Your Honor. We think those two cover. We did raise additional ones in the district court, but the district court addressed those, and we have not raised them again here. I'm not sure I understand your argument with respect to equitable estoppel, but for the extension, why would Mr. Ames be required to continue to do what he did, pay rent, utilities, all of that? Because of the purchase and sale agreement, Your Honor. Once the deadline expired, he wasn't? Again, that is not a deadline on the purchase and sale agreement. The purchase and sale agreement did not have a deadline that said, after this date, you no longer have to cooperate, you no longer have to comply, you no longer have to make sure that there's going to be a smooth transition to Liberty. Those obligations did not end. The only thing that ended on May 8th under the purchase and sale agreement was his opportunity to repurchase. He was still obligated to ensure that Liberty's business was not going to be, he was not going to be hindering Liberty's operation of the business, which means if there are contracts in his name, he had to pay them and get Liberty, seek reimbursement from Liberty, because Liberty was not getting, paying those directly, if that was the case at the time. So he did not, it's not as though the purchase and sale agreement expired on May 8th. These are continuing obligations, and both parties were in exactly the same position before and after the alleged extension. There was no dramatic change in reliance that all of a sudden took place in April when he claims that this offer was extended. Ms. Rushing, there was testimony about this processing center. Yes, Your Honor. That the appellee operated. Did it continue after May 8th? The processing center continued to be open and operating, and it was opened and operated by Liberty. Now, Mr. Ame previously owned the processing center and the nine stores that were associated with it, but in the purchase and sale agreement, Liberty bought them. Liberty operated, owned, and paid for all of these franchise stores and the processing center. So the appellee had no role after May 8th in operating the processing center? Mr. Ame testified that he received bills and paid bills, and he was entitled under the purchase and sale agreement for reimbursement. Was he reimbursed for running the processing center after May 8th? Your Honor, I don't have in front of me the specifics of which expenses were reimbursed and which ones were not, but if they were not reimbursed, it would have been a breach of contract. It would not have been something that shows that he relied on the fact that Liberty had made a promise, and he undertook this knowing he wouldn't be repaid. That's just not the evidence here. The evidence shows that Liberty was required to reimburse. What about the efforts to continue to seek the even? He didn't. Once the deadline passed, he would not have been required to do that, right? That was not a change in his position. That was costly, Your Honor. Again, there's no— Does there have to be a monetary cost? There has to be some evidence that it cost something. Well, it cost him time. It cost him effort. He wouldn't have to do anything. Again, it was not a change in his position to his detriment. It wouldn't have been reasonable to rely on this offer that Mr. Ame himself credibly doubted. We have his April 28th email saying, I've been told I'm not going to get these stores. It would not have been reasonable as a matter of law to rely on that offer to undertake a detriment and reliance on something that you no longer think is going to be the case. I point the court to the Hughes case that we cited in our brief for that proposition. There can be reliance that is so unreasonable, it's unreasonable as a matter of law. And one example is when a party is told the opposite of what they claim they were relying on later. I'd also point out to the court that there's a third ground to reverse here. We think that the district court did not appropriately find acceptance. The district court assessed the evidence of acceptance from Mr. Ame's perspective rather than the aim of a reasonable offeror, which is the legal standard. For example, as Mr. Ame points out in his brief, the district court looked at his explanation for why he said what he did in the April 20th email about let's have a face-to-face meeting, what additional steps are required, which would have suggested to a reasonable offeror that there was more to be negotiated. But the district court said, no, Mr. Ame explained that he just wanted to get the oral contract in writing. Respectfully, that is not the legal standard. The standard that applies is the point of view of a reasonable offeror, and we think the district court misapplied that. Even if the court is not inclined to reverse, we think that the decision must be vacated because of this exclusion of evidence. The district court excluded testimony about the sale and approval process that's referenced in the purchase and sale agreement as a sanction for Liberty's failure to produce documents that conceitedly do not exist. There is no dispute that the documents do not exist, and it's a clear abuse of discretion to exclude testimony for failure to produce documents that a party cannot produce because they do not exist. Mr. Ame claims that Liberty announced the documents don't exist too late, but that was not the ground for the district court's ruling, and there's no obligation under Rule 26 to inform a party when you've finally completed your search and no documents have turned up, especially in a case like this where there's a ruling obligation. I will reserve the remainder of my time. I've got a question. Yes, Your Honor. Before you go, the district judge made a finding that the plaintiffs breached the contract first. Yes, Your Honor. What is the effect of that ruling on any of the issues in this case? Yes, Your Honor. If any. So the district court, there were a number of alleged breaches on both sides, but the district court only addressed the question of first breach. So the court found that Liberty had breached first, and then the court moved to the EFIN extension question because that was relevant for damages. So the damages award here is based on the district court's belief that if Liberty had not breached, Mr. Ame obtained his EFIN and would have had the right to repurchase. And so the damages award are based on this idea that because the time for getting his EFIN was extended, Mr. Ame got his EFIN before December 21st, so therefore he had a right to repurchase. Therefore, he was entitled to the net revenues for 2016 and future lost revenues for the foregoing year. So that's the import of this issue about the extension is that all of the damages flow from it. So if you're right, then the case has to go back for a new trial on damages? If we're right, the case will have to go back, yes, probably to sort out if there are any damages remaining that Liberty would be paying because of that first breach. Yes, Your Honor. Okay, thank you. Thank you. Mr. Snow. May it please the Court, Your Honors. My name is Ryan Snow. I represent the appellees. I mean, we obviously come here with a judgment at hand, and it was based on a district court decision that weighed the credibility of multiple witnesses over multiple days. And based on that, he found that there was, Judge Morgan found that there was absolutely a first breach of the PSA and there was absolutely an extension. And perhaps the irony here is that the one witness out of all of those who could have supported Liberty's arguments that it makes today is their CEO, John Hewitt, who, of course, they chose not to call a trial, and the district judge made inferences as a result. I'll submit to you, Your Honors, that there are two key things that Liberty overlooks, and I'll go backwards in their arguments. They talked about acceptance and that there wasn't acceptance. Well, thing one is this extension is exactly what Mr. Ame wanted and needed, and that is exactly what he had communicated to John Hewitt on January 26th, earlier that year. So why on earth would he not accept when the very thing he needed was offered to him? It just doesn't add up. But thing two is they ignore the person who conveyed that extension. That was a woman named Marie Fletcher, who is undisputed was Liberty Tax's agent. She was the district manager in charge of all this, the exact person you would expect to convey and receive acceptance of that offer. She did that on April 9th in a phone call, but she is like a ghost in Liberty Tax's argument. She just doesn't appear. Why? Because she undercuts everything they say. If she did not think that Mr. Ame accepted the extension, why on earth would she fly all the way up from Florida to testify at this trial for the sole purpose of saying that there was an extension? Again, it doesn't add up. What is the consideration for the new agreement? Yes, sir, and the consideration actually goes hand in hand with the acceptance, and it relates to the things after the fact that show the acceptance. He paid expenses at these stores that he did not have to pay, and I take issue with the idea that he had to pay them anyway. Under the PSA, if he was not going to get these stores back, there is no reason for him to continue paying these expenses. What kind of expenses did he actually pay? He paid telephone expenses, he paid rent, he paid utilities, and for the licensing, the processing call center in particular, he paid a telephone licensing bill there every month, and that was actually a very important unit. He was one of the only people up in the New York area that had that. He paid $100,000 for this processing call center, and the reason that's important is because it's additional consideration. He continued to do that after this April 9th communication. Why? Because he thought he was getting his stores back, and why did that happen? I guess the problem, though, for you, and you need to address this, is how was that, any of what occurred after the fact, after the promise made, bargained for consideration? Yes, Your Honor, and that's where I was going because this is exactly what Liberty knew it would get if it granted his extension. It would get his continued involvement, and with that continued involvement came the fact that he would continue to pay for that call center, and it's not a coincidence that in the record, the extension is conveyed to him on April 9th. On April 11th, two days later, in the testimony of Sergio Jean-Louis, Liberty calls and says, we need to use that call center because they have another franchisee up in New York with 20 stores that the IRS has just shut down, and all of the customers from those stores need to call somebody. Well, Liberty didn't have a call center except this one, and if they got Greg Ame to remain involved, they got the call center. I guess the problem is that bargain for consideration suggests that there's some back and forth between the parties where Liberty Tax would accept all of the things that you say your client did after the fact. That never happened, right? Well, if you're asking whether Mr. Ame had a bargain discussion with John Hewitt. That appears to be what's required. Well, that didn't happen, but that I don't think under the case law is what's required. What's required is that both parties have an expectation of what's going to happen, and the evidence was in the testimony of Marie Fletcher was clear that John Hewitt expected that if he gave this extension to Greg Ame, Greg Ame would stay involved. And the reason that is clear is because he knew Greg Ame had been paying these expenses before. They had tried to get the gentleman named Sergio Jean-Louis to take over the stores, and just before this April 8th meeting down in Florida, they realized that's not going to happen. Well, your opponent says that he would have been obligated to pay all these things in any event and then seek a reimbursement after the fact. Does that hold any water? No, respectfully. That's not how the PSA worked. It wasn't a reimbursement agreement. The PSA says Liberty is responsible for the expenses. They're just supposed to pay them. But as well, the whole point of the PSA, it's a purchase and sale agreement with an option to buy back. If Mr. Ame couldn't buy back, he has nothing left to do with Liberty. And so if he hadn't got that extension on April 9th, he would not have stayed involved. And that's what Liberty knew. That's why they granted it to him, because we all know April 9th set the scene. This is the height of tax season. They cannot have all of Greg Ame's former employees walking away from the offices, which under the testimony of Sergio Jean-Louis is what would have happened. And Liberty knew it because even their own witness testified that a couple had done that already. But under the case law, if I have to do something and that obligation ends and then I continue doing it, that's a detriment to me. And if that detriment also benefits you, that's consideration. And that's why this case is fundamentally different from the string of detrimental reliance cases that Liberty cites where somebody does something to their detriment that has no benefit at all on the other party. You offer me a job and I bought a car as a result. This is not that case because the detriment to Mr. Ame, the things that he's doing, couple exactly with the direct benefit to Liberty. And it's the benefit that Liberty expected when they gave him this extension. That's why there is the consideration. I suggest to your honors if we take a step back from the weeds for a moment and think about why Liberty is making this argument. You understand that there is no challenge on this appeal that they made the offer. And I don't blame them for not challenging that. The evidence was overwhelming. So they made an offer. What they're saying now is that it's almost a gotcha game. The offer was unenforceable. So week after week after week after Mr. Ame is paying thousands upon thousands of dollars and they're accepting, they're not telling him, stop doing that. We didn't give you an extension. They're playing a gotcha game. They offered an extension that they now say after the fact, after receiving all these benefits, was not enforceable in the first place. Silly Mr. Ame, he shouldn't have done all that. And that's what the district court said he can't do. That's why he said this appears to be, and I'll paraphrase, but it's essentially a sham. They never intended to honor the PSA or the extension that they offered. Would you respond to the statute of frauds argument they made? Yes, Your Honor. There are two grounds on this appeal. They may be more below, but there are only two grounds on this appeal. And the first one is that the PSA cannot be performed within a year. And that's just incorrect. The PSA could fully be performed within a year if Mr. Ame had gotten it even by May 8th. Then it's done. Then he gets the stores back and he has new franchise agreements. That was the testimony about what would happen. Even extended, though, to December 31st, it's still less than a year. The whole agreement can be performed within a year. And the covenants that they are discussing that were incorporated in this two-year non-compete, those are post-termination covenants. Those are things they can enforce if he defaults. But if he bought the stores back, those disappear. They're just eviscerated. So they really had no bearing on the analysis. And I suggest that they're red herrings to make it sound like the thing couldn't be completed in a year. But the fact is, if he bought the stores back, it could. And so it's not within the statute of frauds. How about if we were determined it was, what's the role of equitable stockholding in that analysis? Well, I think it applies, Your Honor. This is very much like the T versus T case in the Virginia Supreme Court that established that doctrine in the statute of frauds and said basically you can't use this as a sword when you've caused the other person to rely to his detriment on it. In that case, it had been a wife with a child, and she forewent employment in another place because she thought she was going to get child support, and then they didn't do child support. And their defense was it needed to be in writing. Well, this is very similar to Liberty's defense here, it needed to be in writing. Well, week after week, they allowed Mr. Ame to pay incredible, what added up to several hundred thousand dollars worth of expenses. And it's only now they say, got you, that agreement wasn't enforceable in the first place. You can't use the statute of frauds to commit fraud. Yes, Your Honor. Yes. Would you address the second issue they raised with the doctrine of statute of frauds, which is that five-year franchise agreements obviously had to be in writing. PSA was a modification of that agreement, which would be required to be in writing, and the subject of our controversy today was a modification of that agreement, and that all three should have been in writing. Certainly, Your Honor, and in the steps that you outlined, I take issue with the very first one, which is that the PSA modified the franchise agreements. It did no such thing. In fact, paragraph one of the PSA says the franchise agreements are terminated. They're done. They're gone. You don't think a termination is a form of modification? If it modifies it to zero, I don't mean to be flip, but I don't think it is a modification at all. It's a termination. And I don't take issue with the fact that they pulled some language out of those documents, which is borrowing language that doesn't revive or bring back to life those documents such that they could make the statute of frauds apply, and I just haven't seen any case that would support that either. I should say, Your Honors, when I was talking about what it means if the PSA extension is not enforceable, it really means it was a sham all along. That goes directly to our cross-appeal, which is that the district court, although we concede all the factual findings, I think his factual findings were absolutely correct. He made an incorrect conclusion of law when he said that we can't have a breach of contract and a fraud inducement on the same facts. This Court's opinion in Hitachi, the Virginia Supreme Court's opinions previously, they all say you can have both. And even though you're fraudulently induced to enter a contract, if you ratify and perform, you don't give up that fraud and the inducement count. You can have both, and that's what happened in Hitachi. The district court in Hitachi did just what this district court did and said, now I'll only give you breach of contract but not fraud and the inducement. When it came up to this Court, this Court reversed the ruling on fraud and the inducement only and sent that back saying you can have both and you can get damages for both. The implication, I haven't tried to hide it in our briefs. The implication is that if there is fraud and the inducement, we believe under the Bershader case and Virginia Supreme Court case law that we should have the chance to get attorney's fees. And I will tell you, I know that the district court had an even if argument and said even if I'm exercising my discretion not to give you attorney's fees, and I'm not asking for this Court to award attorney's fees or to even say yes, we must have them. What I'm asking is to send it back to the district court so that he can properly evaluate. He exercised discretion, no doubt, but he did it under the wrong lens because what he did was he weighed our fees against the amount of the judgment, which has nothing to do with making the client whole. And that's the lens through which he should have looked at that case or looked at this case. And had he done that, I think that the fee award would have come out differently. And what we're asking for there is the opportunity to break the correct standard. But we can't get there without the inducement count that I think the district court should have entered. I'm happy to answer any other questions. I've reserved five minutes for rebuttal. But if you don't have them, I'll cede my time. Thank you. Thank you. Ms. Rush. Thank you, Your Honor. On consideration, Liberty did not need to bargain for Ames' continued cooperation after May 8th. Even if he did not repurchase, Section 6 of the Purchase and Sale Agreement obligated him to seek Liberty's consent for assignment of leases, relinquish all interest in the business, and take no action that could hinder or compromise the success of Liberty. That continued to apply after May 8th. Mr. Ames points out that Liberty was required to pay for these expenses. And the way that the parties did that before and after May 8th was that for the contracts that were still in his name, like utilities, he would pay and seek reimbursement for Liberty. His motivation for why he would enter this contract is not consideration. And Judge Diaz, as you pointed out, counsel conceded. There's no bargained-for exchange here. Even if Mr. Ames undertook to continue paying these expenses and considered that his consideration, his gratuitous forbearance or his gratuitous undertaking of a detriment is not legal consideration unless it's bargained for between the parties, and that's missing here. On the statute of frauds, it's simply incorrect that these are post-termination covenants. I point the court to JA 705 and 725. These were obligations that were after the termination of the franchise agreements, but they were in place from day one of the Purchase and Sale Agreement. From the signing of that agreement for two years, the covenants apply. The counsel referred to, well, if he had exercised the option within the year, the Purchase and Sale Agreement would have been terminated. As we explained in our brief, termination is not performance, and courts distinguish between those two for purposes of the statute of frauds. Let me ask you this. I can't find it in the record. My regulation is that the trial judge made a finding that he would never have intended to honor the agreement PSA. Am I right in recalling that? Not quite, Your Honor. What the district court said was that Liberty's conduct during the dispute and during the trial shows that Liberty didn't intend to recognize the right to repurchase. That's on JA 869. So that's what counsel refers to. When you take that with the fact that it doesn't even show up and doesn't testify, when you take that finding back by the trial judge, it really leaves me in an unsettled position about your client obtaining a favorable decision when the trial judge has made a finding he never intended to honor the agreement and he doesn't show up at trial. Tell me how you overcome that very strong finding. Your Honor, again, first, the district court did not make a finding that Mr. Hewitt, at the time he said this in April, never did not intend to honor it. But even more than that, this is a contract case. When a party makes an offer, there must be a showing that there's acceptance, there's consideration, and here it's required to be in writing. This is exactly the sort of situation that the statute of frauds exists to avoid. There's clearly a misunderstanding between the parties about whether there was a contract and what its terms were, and that's why we have the statute of frauds. It exists to avoid exactly this sort of situation. This is not a situation where one party is defrauding another and reaping all sorts of benefits. This is a situation where the parties disagree, and it should have been in writing, and if it were in writing as the law requires, this would have been avoided. Now I want to briefly touch on the cross appeal. The court can resolve the entire cross appeal by deferring to the district court's discretion. There was no abuse of discretion here. Counsel tries to make a legal issue by saying that the district court applied the wrong standard, but the standard to apply is to look at the nature of the relief granted and to avoid a hollow victory, and that's what the court in Berkshire did. That's exactly what the district court here did. It looked at the nature of the relief granted, $2.7 million, and said that victory is not going to be hollow if I don't award attorney's fees, and even if I had the authority under Virginia law, which I don't, and even if I found fraud, which I don't find by clear and convincing evidence, even if both of those were in place, the district court said, I would not exercise my discretion. I think the court can dispose of that entire issue by deferring to the district court's discretion on that, and I would note that if this court wants to wade into the question of whether fees can be awarded in a case of law versus a case of equity, the court would be going far beyond what the Virginia Supreme Court has ever done if it held that fees could be awarded in a case of law such as this. Finally, I would just point out that Mr. Ames mischaracterized the district court's ruling on fraud, and I'd point the court again. That's at JA 869. The district court explains exactly what he was finding. The court did not apply the clear and convincing standard to find that Liberty had, or did not find that Liberty had, by clear and convincing evidence, committed fraud, and he would not have done so on the facts here. Thank you, Your Honors. We request that you reverse. Thank you. I will come down and bring counsel and then talk about it. If I have a 10-minute recess. Okay. This honorable court will take a brief recess.
judges: William B. Traxler, Jr., Albert Diaz, Richard Mark Gergel